Our next case for argument is Grigsby v. Saul, Ms. Young. Thank you. May it please the Court. Ms. Grigsby applied for benefits with an alleged onset date as amended of May 3, 2015. At that time, she was over 55 years of age. The state agency doctors, which are the only medical opinions in the file here, indicated that she was limited to a reduced range of light work with some additional postural limitations. The later of those two opinions was in August of 2016. The judge rejected those opinions for three reasons. First of all, arguing that the later records were inconsistent. I think the brief spelled this out. I'll touch on that a little bit. Second of all, arguing that the claimant only engaged in conservative treatment. I believe that is arguably true of her respiratory issues, but not of her arthritis. And finally, the judge relied on Ms. Grigsby's activities of daily living, which frankly are not of a level that's clearly indicative of a capacity for medium work. I think one of the threshold issues in this case is what level of persuasiveness the judge has to reach in order to reject these state agency doctors. I certainly am not trying to take the position that the state agency doctors are binding on the ALJ. However, they are doctors. They are entitled to some amount of deference. Their opinions are evidence, and the judge should have to reach some sort of a standard to say that that evidence is not persuasive. There was some discussion in the briefs over whether this issue is waived. I think the waiver issue is resolved by Maxwell v. Saul, which pointed out that when it's a pure issue of law and opposing counsel has had the opportunity to address the issue in the briefings, then there is no waiver. And the standard of review is a pure issue of law. It is always before the court. Opposing counsel has proposed that the standard of review is as it always is. Let me ask you a question. Assuming there's not an issue with waiver, does one of our case laws essentially say that the ALJ has to point to reasons in the record? Is there specific evidence in the record? Well, certainly that's what Susan B. Callahan said. To undermine or reject the opinion of a non-treating doctor, a non-examining doctor like these state consultants? That is essentially the holding in Susan, Your Honor, yes. Why isn't that just the rule that applies here? Well, the question is, what does that evidence need to show? Is it sufficient for the judge to simply say, there's evidence, I'm telling you it's contradictory? It doesn't actually have to be contradictory. The underlying Social Security standard is substantial evidence in the record. I think, at a minimum, to meet that standard, the reasons would have to be legitimate and they would have to be specific, which is the same standard that applies to a contradicted physician that has treated the claimant. Well, didn't he say that the state consulting reports, they didn't have the advantage of all the full record at the time they offered their opinion? That is inherently true of the state agency physicians who tendered their opinions at the beginning of the case. There's typically about a year and a half between the latter of those opinions and the hearing, so obviously there's going to be more development. Our contention is that the judge in no way indicated how that later received evidence shows that the claimant is capable of more. I would just like to point to a couple of brief examples. As I said, the later state agency opinion was in August of 2016. In December of 2016, the evidence shows tricompartmental degenerative arthrosis with advanced loss of joint spades. In December of that year, moderate to advanced degenerative disc and joint disease of the lumbar spine. In May of 2017, there's a positive straight leg raise test on the right at 65 degrees. There's reduced strength at L3, L4, and L5, as well as at the hips and the right knee. In March of 2018, there's reduced strength in nearly every muscle group attached to the spine. I had to look up what myotomes means, it's muscle groups attached to the spine. At L5, the strength rating was zero out of five. At no point did the judge explain how that demonstrates the capacity for medium-level exertion. Okay. And that's, I think, what I want to get to is it's not enough for the judge to say this is contradictory. He's got to explain why it's contradictory. Especially whereas here, yes, there's certainly more evidence that came in after the DDS opinions. But if anything, it looks like she got worse, not better. So didn't the judge point to, I think she tried to work. Isn't that correct? I believe that is accurate. I don't think that there's any inherent inconsistency between an attempt to work and a claim for disability. In fact, there are sections of the regulations that specifically protect and encourage people to attempt to work. A trial work period is allowed, and a person can even earn at the substantial gainful level for up to nine months after being found disabled without jeopardizing their benefits. In this case, as long as Ms. Grigby is limited to no more than light exertion, she's entitled to a finding of disability by reason of her age, even if she's able to work at that level. You said there were three matters that the ALJ appointed to. Right. So first was the assertion that the later records are inconsistent, and that's the previous discussion. The second point the judge brought up was that her treatment was conservative. Again, I do concede that her treatment for her respiratory issues was conservative, but her rheumatologist indicated that she had had an adequate response to three oral medications and did not respond to a corticosteroid injection. At excerpts of record 461, the doctor specifically indicated that standard therapy had failed. So at least as far as her arthritis, conservative treatment didn't work. The third issue that the judge raised was the claimant's activities of daily living. Specifically, those were adequate self-care, preparing simple meals, doing household chores, going to the store, walking for exercise, driving a car, and engaging in hobbies like reading, camping, and fishing. At most, camping and fishing could conceivably involve medium-level exertion, and depending on the particulars of what the claimant did, those particulars are not part of the record. These other activities, preparing simple meals, driving a car, reading, the sine qua non of medium-level work under the regulations is the ability to lift 25 pounds frequently. I, for one, have never picked up a book that weighed 25 pounds. Did the NLJ, based on his assessment of her activities of daily living, did he essentially discredit her testimony? Is that what he did? In essence, but he also pointed to that as disagreeing with the state agency doctors, we have not actually raised credibility as a separate issue in this case, but the judge relied on those activities of daily living both to discredit her testimony and to discredit the state agency opinions, which were not in any way predicated on that testimony. The whole basis for your argument is just that the judge, the ALJ, failed to apply the correct standard. That's my belief, and that's why I think it's important to be sure about what exactly the standard is for rejecting a state agency doctor. I agree with you that citation to evidence is important, but I think citation to evidence doesn't articulate what standard the judge has to meet. Although we just asked whether it's substantial evidence, whether it's any meaningful, you know, it's not a high, it's not a standard. It's certainly not a high bar. The basic social security standard is that the judge's decision has to be based on substantial evidence in the record. I think the best articulation of this is in Embree v. Bowen. The ALJ has to do more than just offer his conclusions. He must set forth his own interpretations and explain why they rather than doctors are correct. That's what the judge didn't do here. He pointed to the evidence, but he didn't explain why that evidence shows a capacity for medium rather than light exertion. Would you like to save the balance of your time for rebuttal? Please. Okay. We'll hear from the government. Mr. Gidara. May it please the court, Jordan Goddard appearing on behalf of the Commissioner of Social Security. Good morning, your honors. When Drs. Bernardo and Farwell reviewed the record in 2016, most of the evidence that would ultimately constitute the administrative record had not yet been submitted. The ALJ was reasonable in relying on this later evidence to find that they overestimated Grigsby's limitations by limiting her to light work and that a limitation in medium work was more appropriate. In light of this later evidence, specifically the ALJ pointed to Grigsby's activities of daily living. And we got, I think, two different areas where activities of daily living are significant. One is the mention of fishing and camping that only came up in January 2017 after Drs. Bernardo and Farwell did their reviews of the record. And while we admit that the specific lifting requirements or the exertion that Grigsby went through while doing these activities was not specified, that argument sort of misses the forest for the trees. Because what we're really talking about here is a level of activity that's inconsistent with the general level of limitation that was assessed. Grigsby's limitations are based on pain and fatigue complaints. And if someone is limited to light work, it's reasonable to infer that when asked, what are your current hobbies, they wouldn't respond fishing and camping. And this is something that she volunteered to Dr. Kasube when he asked about her hobbies. She said fishing and camping. A reasonable person would be left scratching their head comparing the assessment of Drs. Bernardo and Farwell that Grigsby was limited to light work because of pain and fatigue and her own later admission that her hobbies or current hobbies were fishing and camping. Things that you don't typically associate with someone who has back, neck, and hip pain as well as knee pain that are so severe that they limit her to light exertion. Additionally, we also have some significant work activity. While Grigsby really downplayed her work activity at the hearing, the ALJ reasonably found that these claims were not consistent with the record and therefore not credible. While she characterizes her work as a possible failed work attempt or trial work attempt, the ALJ specifically rejected that and noted that it was inconsistent with her earnings record. While she characterized her work as sporadic and ending quickly because of her impairments, in fact, we have to keep in mind that she was working for a temp agency or a series of temp agencies and that she was being regularly sent out to jobs according to her earnings record. This was not the record of someone who did an occasional day here or there and wasn't able to continue. This is someone who did a variety of different jobs for different employers but did it pretty regularly based on her earnings. And there are references in the medical record that show that she wasn't just limited to light work when doing those jobs. For example, if we go to the records of nurse practitioner Amanda Hill at ER 435 through 439, we see that in December 2017, Grigsby sought treatment for an ear infection. At the appointment, she mentioned to nurse practitioner, I believe it called her physician assistant, nurse practitioner Hill, that she had hurt her neck six months earlier while lifting a heavy object at work. Based on that timeframe, that would be around June 2017. Notably, she didn't seek any kind of medical attention for this and she wasn't even seeking medical attention for it when she mentioned it six months later. She was seeking medical attention for an ear infection and happened to mention that her neck was painful because of an incident lifting heavy objects at work. On top of that, she told her physical therapist in January 2018 that she had been doing a lot of heavy lifting repetitively at work back in August and that it had worsened her pain. So she told two different treatment providers on two different occasions that she was doing work through apparently this tent agency that required heavy lifting and heavy repetitive lifting, which is very much supportive of the ALJ's conclusion that she was not limited to nearly light work and was capable of doing more specifically medium exertion work and her old job of continuing to do housekeeping, which by the way, she also continued to do when she had clients on top of the work through tent agencies as well as going to college in order to build more skills in order to transition to other work. While admittedly the college work isn't the kind of thing that would demonstrate an ability to perform medium exertion, the fact that she did continue her job as a housekeeper, the job that the ALJ found that she can continue to do, while also doing temp work that required heavy lifting and engaging in hobbies like camping and fishing, satisfy the low bar for substantial evidence. Can I just ask you one question that caught my eye as I looked through the medical records in this case? There seemed to be a consistent complaint on the part of Ms. Grigsby that she suffered from consistent pain and fatigue throughout the years. And then there's some indication that she also suffered from fibromyalgia. And that seems to be both before and after the doctors, the state consultative doctors offered their reports.  Your Honor, if I could address, I think I'm hearing two related questions there and I'm going to try to address them separately. First of all, with respect to the pain and fatigue, you're right that she does consistently make those complaints throughout the record. However, as opposing counsel Ms. Young has admitted, they have chosen not to challenge the ALJ's finding that those subjective complaints were not reliable. So you can't really find error on the part of the ALJ on the basis of subjective complaints that the judge found not to be credible and that Grigsby has effectively conceded. That is also important to keep in mind with respect to the fibromyalgia, which is sort of the second piece of that question. There's not a lot that is attributed to the fibromyalgia specifically. And while there was a consultative examination, and I'm sorry I don't have the doctor's name on the tip of my tongue here, he specifically opined that the fibromyalgia appeared to be mild in nature and would not impose any additional limitations beyond those created by the back, neck, hip, and knee impairments. And that is also unchallenged. So while certainly you could, I guess, come up with a theory of the case based on fibromyalgia and other subjective complaints, that avenue is ultimately closed off by the fact that the ALJ evaluated Grigsby's subjective complaints, found that on the whole the evidence indicated that they were not reliable and that is an uncontradicted finding. And so whether it's back pain, knee pain, or pain and fatigue related to fibromyalgia, those type of complaints simply cannot be a basis for undermining the ALJ's decision at this point. Mr. Goddard, a related question here. Did the ALJ separately evaluate the fibromyalgia diagnosis? You know, I don't want to speak without having all my ducks in a row here because I don't believe this was briefed. So I might have to ask for the opportunity to submit supplemental briefing if this is going to be an issue that this case will turn on. But as I'm seeing here, under step two on page 13 of the excerpts of record, continuing on to 14, the ALJ does discuss fibromyalgia and finds it is not a severe impairment because there's no evidence that it imposed any additional limitations other than those already assessed or those created by other impairments. So the ALJ does discuss that, finds that it is not severe, and again, that is not a contested finding. Thank you. Any other questions, Mr. Goddard? Just one quick point about the— I won't do a deep dive into the standard of review. I believe our briefing covers that more than adequately. But I would point out that opposing counsel's reference to embry and the standard there is a little bit problematic because I believe that the case she's referring to is not talking about a non-examining doctor, but rather— and I don't recall if it's a treating or an examining doctor, but it's important to keep in mind that there are different standards that have been created for different doctors due to the differing amounts of deference owed to them under the regulations. And so you can't simply take the requirements that the court has laid out to the heightened standards that are associated with treating doctors, for instance, and import them over to the substantial evidence review that is described by SUSE in evaluating non-examining doctors' opinions. And with that, I will ask the court that, unless you have any further questions of me, that you would simply affirm the aid of your decision. Okay, thank you. We'll hear from counsel Judy Kellen for a little bit of rebuttal that was left. Thank you. I'll try to be brief. As far as the activities of camping and fishing, I would again point out that the specifics of those activities were not discussed. And in general, a person's activities of daily living, according to Garrison B. Colvin, are just not comparable to the world of work. In the world of work, you're not able to take breaks whenever you want to. You can't get help from other people. You're subject to a standard of activity that you're just not in your activities of daily living. As far as the claimant's work activity, I would note that she was working through a temp agency, as opposing counsel pointed out. It's not clear what kind of temp jobs these were. There is a note, and I'm sorry, I don't have the excerpts of records cited to this, but it's marked 15F, page 71, noted that the claimant had lost three jobs as a housekeeper because she was unable to do the work due to pain. There is some mention that she was doing heavy lifting, but it's not clear what she meant by heavy, and I don't think there's any evidence to suggest that what she meant by heavy is the same as what the regulations mean by heavy. It could very well be that what she meant by heavy was 20 pounds, consistent with the upper limit of life work. We just don't know. I believe that's all I have in this hearing. Okay. No, I don't hear any. Okay. Thank you, counsel. We appreciate your arguments this morning. I move with that. Grigsby v. Stahl is submitted at this time for decision. Thank you, Your Honors.
judges: Paez, Watford, Tunheim